UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FLOYD LEWIS,

 Plaintiff,

v.              Case No. 3:25cv1340-TKW-HTC

UNITED PARCEL SERVICE, INC.,

 Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Floyd Lewis, proceeding *pro se*, initiated this action by filing a complaint in state court, asserting a negligence claim against Defendant United Parcel Service, Inc. ("UPS") for allegedly failing to properly deliver a package containing prescription medication from Maryland to Lewis's home in Pensacola, Florida. *See* Doc. 1-1. UPS removed the action to this Court. Doc. 1. Pending before the Court is UPS's motion to compel arbitration and stay these proceedings under Section 4 of the Federal Arbitration Act ("FAA"). Doc. 11; *see* 9 U.S.C. § 4. Upon consideration of the motion, Lewis's response (Doc. 13), UPS's reply (Doc. 16), Lewis's sur-reply (Doc. 19), and Lewis's separately filed declaration (Doc. 20), the undersigned finds UPS's motion to compel arbitration and stay these proceedings should be GRANTED.

I.  **BACKGROUND**

The following facts are taken from Lewis's complaint and accepted as true for purposes of this report and recommendation.

Lewis is a disabled veteran and a resident of Escambia County, Florida. He depends on prescribed medication to manage his mental health condition. On June 25, 2025, Lewis scheduled a UPS pickup for a package containing his medication. The pickup address was an Extended Stay America in Bel Air, Maryland. The package was confirmed as picked up on June 25 at 2:41 p.m. UPS "failed to provide" Lewis with a tracking number "and did not confirm or notify [Lewis] about the delivery status of the package." UPS also "failed to ensure the correct delivery address," which was an apartment in Pensacola, Florida. "The driver did not follow the provided delivery instructions or procedures as required" under UPS procedures.

On July 1, 2025, the package was returned to the original pickup address, "without explanation or notification." Lewis claims UPS owed him a legal duty to confirm the package pickup with a tracking number, notify him of the tracking or delivery status, communicate with him about issues or delays, and ensure the successful delivery of the package. As a result of the failed delivery, Lewis claims he suffered emotional distress, mental anguish, increased anxiety and depression, loss of self-esteem, loss of potential employment opportunity, and financial harm from time and effort lost. He seeks $7,878,787.00 in damages.

In response to the complaint, UPS filed an answer and a motion to compel arbitration. UPS argues Lewis agreed "multiple times" to arbitrate his claims before the American Arbitration Association in Escambia County, Florida, including: (1) on June 25, 2025, when Lewis created a user ID through ups.com; (2) on June 26, 2025, when Lewis enrolled in UPS My Choice; and (3) every time Lewis logged in to his ups.com account, "including most recently on July 4, 2025." Doc. 11 at 1-2. UPS also argues Lewis's claim falls within the scope of the arbitration provision and that Lewis cannot meet the burden of "proving that the agreement is invalid or does not cover the dispute." *Id.* at 2.

In response, Lewis argues: (1) no valid or enforceable arbitration agreement exists; (2) even if it did, it is procedurally and substantively unconscionable; (3) Lewis's claims for negligence, emotional harm, and "consequential damages" fall outside the scope of arbitration; and (4) UPS does not meet its burden of proof as to consent to arbitration. Doc. 13 at 2; *see also* Doc. 19.

## II. LEGAL STANDARD

"The validity of an arbitration agreement is generally governed by the Federal Arbitration Act." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Federal law counsels that questions

of arbitrability, when in doubt, should be resolved in favor of arbitration." *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1304 (S.D. Fla. Apr. 29, 2019) (internal citations omitted).

A party seeking to enforce an arbitration agreement may petition a court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. The court must then compel arbitration if there is no genuine dispute of material fact as to contract formation. *See Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1347 (11th Cir. 2025) (noting that the § 4 framework for a motion to compel arbitration "mirrors summary judgment") (quoting *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016)).

"When presented with a motion to compel arbitration, a district court will consider three factors: (1) whether a valid agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived." *Abellard v. Wells Fargo Bank, N.A.*, 2019 WL 216389, at *2 (S.D. Fla. May 14, 2019) (citing *Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. Feb. 10, 2010), *aff'd*, 433 F. App'x 842 (11th Cir. 2011). "A plaintiff challenging the enforcement of an arbitration agreement bears the burden to establish, by substantial evidence, any defense to the enforcement of the agreement." *Greene v. Jeffry Knight, Inc.*, 2021 WL 2871199, at *2 (M.D. Fla. Jan 11, 2021).

Once a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, the court must stay the proceeding. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

    To determine whether the parties agreed to arbitrate, the Court should apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 415 U.S. 938, 944 (1995). To determine which state's contract law applies, "the forum court applies its own conflict of law rule." *Paquin v. Campbell*, 378 So. 3d 686, 698 (Fla. 5th DCA 2024). In Florida, "[q]uestions bearing on the interpretation, validity, and obligation of contracts are substantive and governed by the rule of lex loci contractus." *Higgins v. W. Bend. Mut. Ins. Co.*, 85 So. 3d 1156, 1158 (Fla. 5th DCA 2012). Under lex loci contractus, the court applies "the law of the state where the contract was executed." *Paquin*, 378 So. 3d at 690. Here, because Lewis was in Maryland when he created a UPS account on the UPS website and executed his contract with UPS,[1] the Court will apply Maryland state

---

[1] In his sur-reply, Lewis describes himself as a "100% disabled veteran, shipping prescribed mental-health medication from a hotel," indicating he was at the Extended Stay America in Bel Air, Maryland when he signed up for the ups.com account. Regardless, even if Florida contract law applied, the outcome here would be the same.

Case No. 3:25cv1340-TKW-HTC

law to determine whether a valid and enforceable arbitration agreement exists between Lewis and UPS.

## III.   DISCUSSION

For the reasons discussed below, the undersigned finds the undisputed facts show that Lewis agreed to a valid and binding arbitration clause when he entered into a contract with UPS to ship the medication and that the claims alleged herein are subject to arbitration.

### A.   The UPS Terms and Conditions

In support of its motion, UPS submitted a declaration from Shalin Shah, Vice President of Digital Channels at UPS. Doc. 11-1. According to Shah, on June 25, 2025, Lewis created an account on UPS's website, www.ups.com, to schedule a pickup of the package at issue. *Id. at* ¶ 14. As part of the sign-up process, Lewis would have seen a "Sign Up" screen asking Lewis to input his name, email address, telephone number, and to create a username and password. *Id.* ¶ 16. At the bottom of the screen is a check box next to the following:

> I agree to the UPS Tarriff/Terms and Conditions of Service and to the UPS Technology Agreement, which contain important terms about my shipping activity and my use of the UPS Technologies, like including UPS's liability and my agreement on how disputes between UPS and me will be handled.

*Id.*

The screen contains hyperlinks to the "UPS Tarriff/Terms and Conditions of Service" (the "UPS Terms") and the "UPS Technology Agreement." *Id.* at 17. To proceed with the sign-up process, Lewis must check the box next to that agreement. *Id.* Lewis could not create a user ID without agreeing to the Terms. *See id.* at ¶ 18. UPS's records show Lewis agreed to the December 23, 2024, version of the Terms and created a user ID on June 25, 2025. *See id.* at ¶s 15, 18.

The UPS Terms contain the "general terms and conditions of contract under which [UPS] … is engaged in the transportation of Package shipments itself and jointly through interchange with its affiliates[.]" *Id.* at ¶ 8. The UPS Terms provide that "[i]n tendering a Shipment for service, the Shipper agrees that the version of the [Terms] … in effect at the time will apply to the Shipment and its transportation" and further notifies the shipper that "[a]ll Shipments are subject to the terms and conditions contained in the [Terms]." *Id.*

The UPS Terms contain a mandatory arbitration requirement that states as follows:

> Claimant and UPS agree that, except for disputes that qualify for state courts of limited jurisdiction (such as small claims, justice of the peace, magistrate court, and similar courts with monetary limits of less than $30,000 on their jurisdictions over civil disputes), any controversy or claim, whether at law or equity, arising out of or related to the provision of services by UPS, regardless of the date of accrual of such dispute, shall be resolved in its entirety by individual (not class-wide nor collective) binding arbitration.

*Id.* at ¶ 9.

A "Claimant" is defined as "any person asserting … any claim in any forum for legal or equitable relief … arising out of or related to the provision of services by UPS." *Id.*

The UPS Terms also include an express waiver of jury and court trials and specifically state, "Claimant and UPS acknowledge and agree" that they are:

> WAIVING THE RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DIPSUTE ALLEGED AGIANST CLAIMANT, UPS OR RELATED THIRD PARTIES
>
> WAIVING THE RIGHT TO HAVE A COURT, OTHER THAN A STATE COURT OF LIMITED JURISDICTION AS DEFINED ABOVE, RESOLVE ANY DIPSUTE ALLEGED AGAINST CLAIMANT, UPS OR RELATED THIRD PARTIES

*Id.* at ¶ 10 (emphasis in original).

The UPS Technology Agreement ("UTA") also references the UPS Terms and states that "ALL TENDERED SHIPMENTS, INCLUDING BUT NOT LIMITED TO, THOSE NOT SUBJECT TO A SHIPPING SERVICES CONTRACT, ARE SUBJECT TO THE TERMS" and provides a hyperlink to the Terms. *Id.* at ¶s 11-12 (emphasis in original).

In addition to having to affirmatively agree to the UPS Terms and the UTA when he signed up for a UPS account, Lewis accepted the UPS Terms and the UTA each time he logged into his UPS account. *Id.* at ¶ 19. Specifically, the log-in screen states, "By Continuing, I agree to the UPS Tariff/Terms and Conditions of Service

and the UPS Technology Agreement in effect at the time of shipping." *Id.*  UPS's records show that Lewis last logged into his UPS account on July 4, 2025. *Id.*

Lewis also signed up for a UPS My Choice account on June 26, 2025. *Id.* at ¶ 20.  This service gives members more flexibility and control over packages that UPS delivers to their homes including, for example, receiving alerts.  Like the process for signing up for a regular UPS account, Lewis had to check a box agreeing to the UPS Terms and the UTA to sign up for a UPS My Choice account. *Id.* at ¶ 21.  Like the regular "Sign-up" screen, the UPS My Choice screen also contains hyperlinks to the Terms and the UTA. *Id.* at ¶s 25-26.

### B. A Valid Agreement to Arbitrate Exists

Lewis does not dispute that he signed up for a UPS account or that he signed up for a UPS My Choice account.  He also does not dispute that he clicked the boxes indicating his agreement to the Terms and the UTA or that the entirety of the Terms and UTA were available to him via hyperlink.  Moreover, he does not dispute that the UPS Terms contain an arbitration provision.

Instead, Lewis argues he should not have to arbitrate his claims against UPS because (1) the Terms were "not reasonably communicated or knowingly accepted" and (2) they are procedurally and substantively unconscionable. *See* Docs. 13 & 19.  Specifically, Lewis argues the Terms were not "clearly disclosed or explained" to him because (1) they "appear roughly thirty pages into a lengthy PDF, accessible

only by hyperlink," and (2) he is a "100% disabled veteran, shipping prescribed mental-health medication from a hotel." Doc. 19 at 1. He further argues, "[t]here is no signed agreement,[2] no express acknowledgement, and no documentation showing [he was] properly notified of, or assented to, any arbitration clause." Doc. 13 at 2. None of Lewis's arguments hold water.

An agreement to arbitrate disputes is enforceable under Maryland law if it is a valid contract. *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 660-62 (Md. 2003). Under Maryland law, the "elements of a contract are offer, acceptance, and consideration." *B-Line Med., LLC v. Interactive Digit. Sols., Inc.*, 57 A.3d 1041, 1055 (Md. Ct. Spec. App. 2012). UPS has sufficiently established the existence of a valid arbitration agreement.

The UPS Terms are part of what is referred to as a "clickwrap" agreement. A clickwrap agreement is an agreement that requires "[a] customer [to] affirmatively click a box on the website acknowledging receipt of and assent to the contract terms before he or she is allowed to proceed using the website." *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009) (finding forum selection clause in clickwrap agreement was enforceable). Circuit and district courts have routinely upheld clickwrap agreements when "under traditional principles of contract law,"

---

[2] A lack of a physical signature has no effect on the validity of the agreement here because there are no conditions precedent to contract formation regarding the requirement of a signature. *See All State Home Mortg., Inc. v. Daniel*, 977 A.2d 438, 448 (Md. Ct. Spec. App. 2009).

"the plaintiff had reasonable notice of and manifested assent to the online agreement." *CoStar Realty*, 612 F. Supp. 2d at 669 (citing *Burcham v. Expedia, Inc.*, 2009 WL 586513, at *1-2 (E.D. Mo. March 6, 2009)).

In determining whether a user sufficiently assented to the terms of a clickwrap arbitration agreement, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Starke v. Square Trade, Inc.*, 913 F.2d 279, 289 (2d Cir. 2019). Thus, a clickwrap agreement will be upheld "so long as it 'reasonably communicate[s]' the existence of the contract terms." *Lyles v. Chegg, Inc.*, 2020 WL 1985043, at *3 (D. Md. Apr. 27, 2020) (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (collecting cases)).

Here, the undersigned finds Lewis had reasonable notice of the arbitration agreement. When Lewis signed up for the UPS account and the UPS My Choice account, he was asked to agree to the UPS Terms and UTA. He was advised that the UPS Terms and UTA contained important terms "like limiting UPS's liability and [his] agreement on how disputes between UPS and [him] would be handled." The UPS Terms and the UTA were hyperlinked, as indicated by their blue text, directing users to their provisions. While Lewis takes issue with the UPS Terms being in a separate agreement, not being in plain English, and being accessible only by hyperlink, none of those circumstances invalidates the arbitration agreement. *See*

*Meyer*, 868 F.3d at 77-80 (noting, in granting a motion to compel arbitration, that a reasonably prudent digital user recognizes indicators of hyperlinked text and is on notice of additional information contained on the hyperlinked page); *Rivas v. Experian Info. Sols., Inc.*, 2026 WL 111337, at *9 (D. Md. Jan. 15, 2026) (website features such as "bold text, blue hyperlink, and uncluttered background would all place a reasonably prudent user on notice of [the] contractual offer") (citing *Austin v. Experian Info. Sols., Inc.*, 148 F.4th 194, 206 (4th Cir. 2025)). In fact, whether Lewis clicked on the links or was required to do so is irrelevant. *See Gordon v. Zeroed-In Tech., LLC*, 2025 WL 941365, at *9 (D. Md. Mar. 26, 2025) ("The fact that actually clicking on the hyperlink was not mandatory does not change the nature of the clickwrap agreement, which courts have routinely upheld.").

Moreover, although the UPS Terms is thirty-seven (37) pages long (including front and back cover pages), it contains a two-page "Table of Contents," in which each section's location is designated by a page number embedded with its own hyperlink, upon a click, takes the user directly to any section he wishes to read. *See* Doc. 11-1 at 18-19. If Lewis had skimmed only the Table of Contents, he would have seen that Section 55—the title of which is in bold font and states, "Claims and Legal Actions: Individual Binding Arbitration of Claims"—begins on page 29 of the Terms. Doc. 11-1 at 19. The Table of Contents and its internal hyperlinks gave Lewis further reasonable notice of the arbitration provision. *See Teta v. Go New York*

*Tours, Inc.*, 738 F. Supp. 3d 502, 509 (S.D.N.Y. July 1, 2024) ("A web user may be bound by a clickwrap arbitration agreement where they had 'reasonable notice of the arbitration provision.'"), *motion to certify appeal denied,* 2024 WL 4850844 (S.D.N.Y. Nov. 21, 2024). Because the hyperlinks were clear and Lewis could easily locate the arbitration agreement once he clicked the hyperlink, he had reasonable notice of the arbitration provisions. *See Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 697 (E.D. Va. 2020).

And Lewis manifested his assent to the UPS Terms by affirmatively clicking the boxes acknowledging his agreement to the UPS Terms when he signed up for the UPS account, when he signed up for the UPS My Choice account, and each time he logged on to the UPS website. *See, e.g., George v. Experian Info. Sols.*, 2024 WL 3013146, at *6 (D. Md. June 14, 2024) (finding plaintiff had reasonable notice that her click manifested assent to an arbitration agreement); *Lyles*, 2020 WL 1985043, at *3 (finding assent to arbitration agreement where plaintiff created a user account for which the terms and conditions were visible when the user hovered over the word "Terms" under a "Sign up" button).

Although Lewis takes issue with the lack of a signed agreement, and claims to not recall clicking the boxes, Lewis does not dispute he was required to click the box to sign up for these accounts or that he did so. *See George*, 2024 WL 3013146, at *8 (finding a valid arbitration agreement existed over plaintiff's argument that she

did "not recall" entering an agreement, where plaintiff created an online account dependent on agreeing to a clickwrap Terms of Use). Indeed, UPS has produced screenshots of its electronic records showing Lewis created a user ID for his UPS account on June 25, 2025, and enrolled in UPS My Choice on June 26, 2025. He could not have done either without having agreed to the UPS Terms and UTA. *See Marshall v. Georgetown Mem. Hosp.*, 112 F4th 211, 221 (4th Cir. 2024) ("When website buttons have labels denoting assent, like 'I accept' or 'I agree,' a user's click 'can suffice to signify the acceptance of a contract.'") (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016)).

Thus, Lewis is bound to the arbitration agreement. *See Teta*, 738 F. Supp. 3d at 509 ("because Plaintiffs had a sufficient opportunity to read the agreement and assented to the agreement by affirmatively clicking on the box, the parties are bound by the agreement"); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015) (finding that almost every district court to consider the issue "has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable"); *Lyles*, 2020 WL 1985043, at *3 ("Courts applying Maryland law have upheld clickwrap agreements—that is, 'agreements that require a customer to affirmatively click a box on the website acknowledging receipt of an assent to the contract terms before he or she is allowed to proceed using the website.'") (internal citations omitted).

Lewis's status as a disabled veteran does not alter this conclusion. Under Maryland law, mental capacity to contract is presumed and the burden to show incapacity is on the party arguing such incapacity. *Keene v. Comcast Cable Commc'ns Mgmt., LLC*, 2025 WL 416262, at *4 (D. Md. Feb. 5, 2025) (granting defendant's motion to compel arbitration over plaintiff's argument that her "mental incapacity made her incapable of consenting to any sort of agreement … ."). "For a party to be deemed incapable to contract, she must prove that she was 'unable to understand in a reasonable manner the nature and consequences of the transaction' or 'unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of this condition.'" *Id.* (citing *Smith v. Montgomery Cnty.*, 2019 WL 1130156, at *4 (D. Md. Mar. 12, 2019)).

In his declaration, Lewis asserts he has "mental-health impairments that affect [his] ability to concentrate, manage stress, and process dense or complex legal and contractual language, particularly when [he] is under pressure." Doc. 20. However, even accepting those allegations as true, they do not show that Lewis was "incapable" of understanding the UPS Terms or the arbitration provision. *See Keene*, 2025 WL 416262, at *5. To the contrary, the Court notes that despite his alleged impairments, Lewis is proceeding in this case *pro se* and was able to file a coherent complaint, response, declaration, and sur-reply. His mental status, therefore, does not make the agreement invalid or render it unconscionable.

Finally, Lewis asserts he had "no meaningful ability to negotiate or reject the [Terms]." Doc. 19 at 3. However, "[e]ven contracts of adhesion—those drafted unilaterally by the dominant party and then presented on a take-it-or-leave-it basis—are only unconscionable if the terms in the arbitration clause are so one-sided as to oppress or unfairly surprise an innocent party or [where] there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause." *David v. Tesla, Inc.*, 720 F. Supp. 3d 390, 397-98 (D. Md. Mar. 8, 2024) (internal quotations and citations omitted). Lewis claims the UPS Terms are "unreasonably harsh and one-sided" because they compel individual and confidential arbitration, outline strict internal claims procedures, and state broad disclaimers of liability. Doc. 19 at 4. The undersigned disagrees.

The arbitration provision at issue does not "shock[] the conscience." First, the agreement is mutual, that is, *both* UPS and Lewis waive the right to a jury trial; *both* waive the right to have a court review an arbitrator's decision or award; and *both* waive the right to a class action. *See* Doc. 11-1 at 45-48; *see also David*, 720 F. Supp. 3d at 398 (finding no unconscionability where both plaintiff and Tesla "bound themselves to arbitrate all employment-related disputes"). Second, UPS offers to "pay the amount of [filing fees] in excess of" the amount "of the fee required to commence a similar action in a court that otherwise would have jurisdiction." Doc. 11-1 at 45. Thus, Lewis will not incur any additional fees to arbitrate his

claims. And while Lewis claims the "sweeping liability Limitations … effectively deny [him] any meaningful remedy for the actual injuries he suffered," (Doc. 19 at 4), the UPS Terms clearly state, "An arbitrator can only award *the same damages and relief* that a court can award" (Doc. 11-1 at 45) (emphasis added).

Because the undisputed facts establish that a valid and binding arbitration agreement exists between UPS and Lewis, the undersigned finds an evidentiary hearing to be unnecessary. *See e.g., Garcia v. J&J, Inc.*, 2019 WL 5862967, at *5 (S.D. Fla. Nov. 8, 2019) (denying motion to compel arbitration without evidentiary hearing "[b]ecause the determination of whether parties have agreed to submit a dispute to arbitration is an issue of law subject to judicial resolution"); *Turner v. U-Haul Co. of Fla. 905, LLC*, 2008 WL 709107 (M.D. Fla. Mar. 14, 2008) (denying motion to compel arbitration without evidentiary hearing based on undisputed facts contained in motion papers).³

---

³ *See also Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.*, 169 F. Supp. 2d 1341, 1348 (M.D. Fla. 2001) ("While Section 4 of the Federal Arbitration Act directs the court to conduct an evidentiary hearing when the existence of an arbitration agreement is in dispute, no evidentiary hearing is necessary here because, while some contractual details may be disputed, the Court has determined from the factual record before it that there was consensus about arbitration."); *see also Exec. Affiliates, Inc. v. Pucciano & Eng., Inc.*, 2007 WL 9706648, at *2 (M.D. La. June 27, 2007) ("As when opposing a motion for summary judgment under Fed. R. Civ. P. 56, the party requesting an evidentiary hearing or jury trial must "submit evidentiary facts showing that there is a dispute of fact to be tried.").

## C. Lewis's Claim Falls Within the Scope of the Arbitration Provision

In determining the scope of an arbitration clause, the court must find "reliable evidence from the language actually employed in the contract that the parties intended the disputed issue to be the subject of arbitration, the intent of the parties being the controlling factor." *Joseph F. Trionfo & Sons v. Ernest B. LaRosa & Sons, Inc.*, 381 A.2d 727, 732 (Md. Ct. Spec. App. 1978) (citing *Pumphrey v. Pumphrey*, 191 A. 235 (Md. 1937)). When the language of an arbitration clause is plain and the issue in dispute clearly falls within its scope, the court must compel arbitration. *NRT Mid-Atl., Inc. v. Innovative Props., Inc.*, 797 A.2d 824, 834 (Md. Ct. Spec. App. 2002), *overruled in part on other grounds by Addison v. Lochearn Nursing Home, LLC*, 983 A.2d 138, 151 n.13 (Md. 2009).

The arbitration agreement at issue states "[a]ny controversy or claim arising out of or related to the provision of services by UPS … shall be resolved in its entirety by individual [] binding arbitration." Doc. 11-1 at ¶ 9. "The Supreme Court and the Fourth Circuit have construed language such as that used here—'any controversy or claim arising out of or relating' to an agreement—to be broad arbitration clauses capable of an expansive reach." *Barnes v. Ont. Drive & Gear Ltd.*, 2010 WL 311648, at *2 (D. Md. Jan. 20, 2010) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398, 406 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or

relating to this Agreement.") and *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996) (same)).

Lewis sues UPS in this case for failing to timely deliver his medication, a shipment which he arranged on the UPS website, after setting up a UPS account. The Court easily finds Lewis's claims arise out of and relate to the service he sought for UPS to provide to him. Lewis's claims are subject to arbitration.

## IV.    CONCLUSION

For the reasons set forth above, the undersigned finds Lewis's claims against UPS are subject to binding arbitration.

Accordingly, it is respectfully RECOMMENDED that:

1.    Defendant's motion to compel arbitration and stay these proceedings (Doc. 11) be GRANTED.

2.    This case be STAYED under 9 U.S.C. § 3 pending resolution of binding arbitration.

3.    Within **fourteen (14) days** of completion of arbitration or other resolution, the parties shall file a notice with the Court advising whether the case shall be reopened or dismissed.

4.    The clerk administratively close the case.

At Pensacola, Florida this 22nd day of January, 2026.

/s/ *Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.